INTERNATIONAL BROTHERHOOD OF PAPER MAKERS, LOCAL No. 66 (A. F. L.), and others, Appellants, vs. WISCONSIN EMPLOYMENT RELATIONS BOARD, Respondent.*

*September 12—October 10, 1944.*
*September 13—October 22, 1946.*

* Motion for rehearing denied, with $25 costs, on December 18, 1946.

The cause was submitted for the appellants on the briefs of *Padway & Goldberg,* attorneys, and *David Previant* of counsel, all of Milwaukee, and for the respondent on the briefs of the *Attorney General, Stewart G. Honeck*, deputy attorney general, and *Beatrice Lampert,* assistant attorney general.

ROSENBERRY, C. J.  In 1941, the National Labor Relations Board conducted a collective-bargaining election among the employees of the Rhinelander Paper Company.  The union failed to receive a majority of the votes cast.  In 1942, a representative of the National Labor Relations Board checked the signed union membership cards against the pay roll of the company and advised the company that the union at that time represented a majority of the employees.  Upon the basis of that report, the company thereafter recognized the union as the sole collective-bargaining agent.

On July 30, 1943, the company and the union entered into a collective-bargaining agreement which specified, among other things, that new employees—

"must join the signatory union and maintain membership in good standing as a condition of continued employment."

One Netling was employed by the Rhinelander Paper Company in 1942 and continued in its employment until the 23d day of August, 1943, when he was discharged because he had not joined the union.

Netling thereupon brought the matter before the Wisconsin Employment Relations Board which found the Rhinelander Paper Company guilty of an unfair labor practice because no collective-bargaining agreement had been authorized by three fourths of the employees of the company by secret ballot, taken pursuant to the Wisconsin Employment Peace Act. Sec. 111.06 (1) (c), Wis. Stats. 1943.

The board entered an order requiring the defendant to cease and desist from encouraging membership in the union, also requiring the company to offer Netling a reinstatement and to make good his wage loss and certain other things.

The order further required the International Brotherhood of Paper Makers, Local No. 66, A. F. L., to take the following affirmative action:

"Pay to the respondent, Rhinelander Paper Company, one half of the amount of money for wages required to be paid by the Rhinelander Paper Company to Gwynne Netling from the date of his discharge to the date of his reinstatement."

The matter was appealed to the circuit court where the order was affirmed with the exception of the clause requiring the union to reimburse the Rhinelander Paper Company for one half of the amount it paid to the respondent Netling, which was vacated.

The question is here because of the fact that the union claims that the National Labor Relations Board having conducted

an election, the matter of labor relations between the Rhinelander Paper Company and its employees passed to the exclusive jurisdiction of the National Labor Relations Board and for that reason the state had no jurisdiction under the Employment Peace Act.

Since the matter was suspended in October, 1944, the United States supreme court has made two decisions which are now cited to our attention and upon which the union relies.

The first of these cases is *Hill v. Florida* (1945), 325 U. S. 538, 65 Sup. Ct. 1373, 89 L. Ed. 1782. A state statute required business agents of labor unions to procure a license and prescribed their qualifications and made the issuance of the license depend upon a determination by a state officer that the licensee possessed such qualifications as the act prescribed. The supreme court of the United States held this provision invalid because it deprived employees of the full freedom of choice as to their collective-bargaining representative, given under the National Labor Relations Act (29 USCA, sec. 151).

The second case is *American Federation of Labor v. Watson* (1946), 327 U. S. 582, 66 Sup. Ct. 761, 763, 90 L. Ed. Adv. Opinions, p. 715. Florida passed an amendment to its constitution which provided:

"The right of persons to work shall not be denied or abridged on account of membership or nonmembership in any labor union, or labor organization; provided, that this clause shall not be construed to deny or abridge the right of employees by and through a labor organization or labor union to bargain collectively with their employer."

The Florida supreme court had not passed upon the amendment. The judgment was reversed and cause remanded to the district court to await the determination of proceedings in the state court.

A consideration of the decisions of the supreme court of the United States shows that the court did not attempt to construe sec. 8 (3) of the National Labor Relations Act, 29 USCA, sec. 158 (3), which provides:

"It shall be an unfair labor practice for an employer . . .

"(3) By discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: *Provided,* that nothing in this act, or in the National Industrial Recovery Act (USC Supp. VII, title 15, secs. 701–712), as amended from time to time, or in any code or agreement approved or prescribed thereunder, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this act as an unfair labor practice) to require as a condition of employment membership therein, if such labor organization is the representative of the employees as provided in section 9 (a) in the appropriate collective-bargaining unit covered by such agreement when made."

It is the principal contention of the union that this provision of the National Labor Relations Act confers upon the unions and employers the power to enter into an agreement for a closed shop and sec. 111.06 (1) (c) of the Employment Peace Act already referred to is in conflict with it. Counsel have repeatedly argued to this court that sec. 8 (3), National Labor Relations Act, already quoted, confers a right. Departing from the precise language of sub. (3), the proviso is as follows: Nothing in this act shall preclude an employer from making an agreement with a labor organization which requires as a condition of employment membership in a union. Just how this clause grants a right, it is difficult to see.

It may be inferred from the language of the proviso that there·was some doubt in the minds of the members of the committee as to whether the right to bargain for a closed shop

had not been limited either by the National Industrial Recovery Act or in the National Labor Relations Act. To make it clear that congress had not intended to so limit the right, the proviso was inserted.

It is well settled that reports of committees of the house of representatives and of the senate may be consulted to ascertain the intent of congress as to the meaning of a statute enacted by it. *Wright v. Vinton Branch, etc.* (1937) 300 U. S. 440, 57 Sup. Ct. 556, 81 L. Ed. 736, 112 A. L. R. 1455, and cases cited in note 8, p. 1463.

Referring now to Senate Reports 74th Congress, 1st session (1935) Report No. 573, we find the following (p. 11) :

### "PROBLEM OF THE CLOSED SHOP.

". . . Propaganda has been widespread that this proviso attaches special legal sanctions to the closed shop or seeks to impose it upon all industry. This propaganda is absolutely false. The reason for the insertion of the proviso is as follows : According to some interpretations, the provision of section 7 (a) of the National Industrial Recovery Act, assuring the freedom of employees 'to organize and bargain collectively through representatives of their own choosing,' was deemed to illegalize the closed shop. The committee feels that this was not the intent of congress when it wrote section 7 (a) ; that it is not the intent of congress today; and that it is not desirable to interfere in this drastic way with the laws of the several states on this subject.

"But to prevent similar misconceptions of this bill, the proviso in question states that nothing in this bill, or in any other law of the United States, or in any code or agreement approved or prescribed thereunder, shall be held to prevent the making of closed-shop agreements between employers and employees. In other words, the bill does nothing to facilitate closed-shop agreements or to make them legal in any state where they may be illegal; it does not interfere with the *status quo* on this

debatable subject but leaves the way open to such agreements as might now legally be consummated, with two exceptions about to be noted.

"The assertion that the bill favors the closed shop is particularly misleading in view of the fact that the proviso in two respects actually narrows the now ·existent law regarding closed-shop agreements. . . .

"Secondly, the bill is extremely careful to forestall the making of closed-shop agreements with organizations that have been 'established, maintained, or assisted' by any action defined in the bill as an unfair labor practice. . . ."

This report sustains the construction of the proviso that we have adopted (*International B. of E. W. v. Wisconsin E. R. Board,* 245 Wis. 532, 15 N. W. (2d) 823), that is, that it granted no right but if there were any impediments to such an agreement in the laws of the United States, they were removed by the provisions of sec. 8 (3), National Labor Relations Act.

The only question remaining to be determined is whether there is a conflict between sec. 8 (3), National Labor Relations Act, and sec. 111.06 (1) (c), Wis. Stats. The proviso in sec. 8 (3) of the National Labor Relations Act was enacted to remove any possible restriction in the federal law on the right of employer and employees to bargain for a closed shop, and it did no more than leave the matter where it was. Sec. 111.06 (1) (c), Wis. Stats., authorizes the making of a contract for a closed shop between employer and employee in the manner therein specified. We are utterly unable to see that there is any conflict between these two provisions. From the report of the committee it appears that congress intended to leave state laws regarding the closed shop in force.

Netling having been discharged pursuant to a closed-shop agreement which was in violation of state law, his discharge was clearly wrongful as the trial court held.

Sec. 111.07 (4), Wis. Stats., provides that final orders may require the person complained of—

"to take such affirmative action, including reinstatement of employees with or without pay, as the board may deem proper."

We concur in the view of the trial court that this statute authorizes the reinstatement of employees with or without pay. The obligation to pay being upon the employer and not upon the union, the trial court correctly held that there was no authority under the act for dividing the obligation imposed upon the employer by requiring his employees to pay one half as the order of the board required them to do.

All other questions argued have been covered in the previous opinion in the case of *International B. of E. W. v. Wisconsin E. R. Board, supra,* and we do not find it necessary to discuss them further.

*By the Court.*—Judgment affirmed.

RECTOR, J., took no part.